eFile Accepted: 02/17/2015 09:06 AM

Filing # 23774489 E-Filed 02/13/2015 05:44:37 PM

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA
CIVIL DIVISION

CHRISTOPHER DATTA,

      Plaintiff,

vs.

                                          CASE NO.:
                                          DIVISION:

ARMOR CORRECTIONAL HEALTH SERVICES,
INC., a Florida corporation, FRANTZ SIMEON, M.D.,
SONJA CARSTENS, ARNP, LISA BURK, R.N.,
JAMES ATKINSON, R.N., and LARA ENNIS, R.N.

      Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Christopher Datta sues Defendants Armor Correctional Health Services, Inc. ("ACHS"), Frantz Simeon, M.D. ("Dr. Simeon"), Sonja Carstens, ARNP ("Practitioner Carstens") Lisa Burk, R.N. ("Nurse Burk"), James Atkinson, R.N. ("Nurse Atkinson") and Lara Ennis, R.N. ("Nurse Ennis"), and states:

## GENERAL ALLEGATIONS

1.     This is an action for damages in excess of $15,000.00 and is within the subject matter jurisdiction of this Court.

2.     At all times material hereto, Christopher Datta was a resident of Sarasota County, Florida.

3.     At all times material hereto, ACHS was a corporation, duly organized under the laws of the State of Florida, located and engaged in the business of providing medical services in Sarasota County, Florida.

4.   At all times material hereto, Dr. Simeon was a physician duly licensed to practice medicine in the state of Florida, and practicing medicine in Sarasota County, Florida as a general practice physician.

5.   At all times material hereto, Practitioner Carstens was an advanced registered nurse practitioner, licensed by the state of Florida, and practicing in Sarasota County, Florida.

6.   At all times material hereto, Nurse Burk was a registered nurse employed by ACHS and residing in and practicing nursing in Sarasota County, Florida.

7.   At all times material hereto, Nurse Atkinson was a registered nurse employed by ACHS and practicing nursing in Sarasota County, Florida.

8.   At all times material hereto, Nurse Ennis was a registered nurse employed by ACHS and practicing nursing in Sarasota County, Florida.

9.   Venue is proper in Sarasota County Circuit Court because Plaintiff's causes of action arose in Sarasota County, Florida, and alternatively, because at least one of the Defendants resides in Sarasota County, Florida, and alternatively, because all of the Defendants transact business in Sarasota County, Florida.

10.   On or about November 21, 2014, pursuant to Section 766.104(2), Florida Statutes, Plaintiff received an automatic 90-day extension of the statute of limitations period by filing a petition with the circuit court of the Twelfth Judicial Circuit in and for Sarasota County, Florida.

11.   Plaintiff has complied with all pre-suit requirements, including, but not limited to, the pre-suit investigation requirements of Section 766.203, Florida Statutes, as well as the notice requirements of Section 766.106, Florida Statutes.

12.   All conditions precedent to the bringing of this action have occurred, have been waived or have otherwise been fulfilled.

13.     Pursuant to Section 776.104, Florida Statutes, the undersigned attorney hereby certifies that a reasonable investigation has been made and that such reasonable investigation has given rise to a good faith belief that grounds exist for a claim of medical negligence against each of the Defendants in this action.

14.     Sarasota County and the Sarasota County Sheriff's Office have an obligation to provide medical care to inmates confined in the Sarasota County Jail (the "Jail").

15.     At all times material hereto, ACHS had a contract with the Sarasota County Sheriff's Office pursuant to which it undertook the obligation to provide medical care to inmates in custody at the Jail, and therefore, ACHS has an obligation to provide medical care to inmates in custody at the Jail.

16.     The contract between the Sarasota County Sherriff's Office and ACHS dis-incentivizes ACHS from sending inmates to a hospital for emergency medical services, for hospitalization, or for off-site medical specialist care, by requiring ACHS to pay the costs of such services if the inmate does not have health insurance to pay for such services.

17.     ACHS has a widespread policy, custom or practice at the Jail whereby ACHS's medical personnel and employees, including, but not limited to, its doctors, nurse practitioners, nurses and other personnel are encouraged not to send inmates to the hospital for emergency medical services and to delay sending inmates to the hospital for emergency medical services.

18.     ACHS also has a widespread policy, custom or practice at the Jail whereby ACHS's medical personnel and employees, including, but not limited to, its doctors, nurse practitioners, nurses and other personnel are discouraged from requesting diagnostic studies that are not available at the Jail, such as a MRI, to assist in the evaluation and diagnosis of an inmate's medical condition.

19. ACHS implemented, established and/or encouraged these policies, customs or practices for financial reasons and in deliberate indifference to the serious medical needs of inmates confined at the Jail.

20. Mr. Datta was originally arrested in September 2013 for possession of marijuana and Xanax and was taken to the Jail.

21. While incarcerated at the Jail, on November 13, 2013, a patient intake health screening was performed on Mr. Datta by Patricia Shollenberger, LPN ("Nurse Shollenberger"), who is also an employee of ACHS.

22. Mr. Datta informed Nurse Shollenberger that he had spinal stenosis and a bulging disc, which is documented in his Jail medical records.

23. On November 22, 2013, he also reported a history of spinal stenosis and herniated/bulging discs in his lower back with sciatica to Sally Comegys, RN ("Nurse Comegys"), another ACHS employee, when she performed a patient health assessment on him.

24. In addition, the Jail obtained some of Mr. Datta's prior medical records from Sarasota Memorial Hospital indicating that Mr. Datta had a past medical history of a herniated disk and spinal stenosis, which became part of Mr. Datta's permanent medical records at the Jail.

25. On or about December 18, 2013, Mr. Datta pled guilty to the drug possession charges. Adjudication was withheld, he was sentenced to probation, and he was released from the Jail shortly thereafter.

26. On Friday, April 11, 2014, Mr. Datta was arrested for a probation violation and was taken back to the Jail where he remained until Wednesday, April 23, 2014.

27. During this time period he was denied access to necessary medical care.

28.    As indicated above, Mr. Datta had a history of lower back problems, which the medical personnel at the Jail were aware of.

29.    In addition to the information Mr. Datta had previously provided to the medical personnel at the Jail in 2013, after Mr. Datta was booked into the Jail on April 11, 2014, a patient intake health screening was performed by Nurse Shollenberger during which Mr. Datta again informed her of his prior history of lower back problems, which she documented in his medical records at the Jail as "spinal stenosis, degenerative disk sciatica."

30.    Also, when Mr. Datta was booked on April 11, 2014, he was wearing a knee brace on his right leg.  Mr. Datta informed Nurse Shollenberger that he was recovering from a knee fracture, which was almost healed by the time of his arrest.

31.    During the intake health screening, Mr. Datta was asked whether he had health insurance and he informed Nurse Shollenberger that he did not.

32.    When he was booked on April 11, 2014, he was able to walk without any difficulty or assistance and was in relatively good physical condition.

33.    As a result, he was put in the general population of the Jail.

34.    On the afternoon of Thursday, April 17th, Mr. Datta's back began bothering him more than usual.  The pain got progressively worse as the day went on.

35.    By 7:00 p.m., Mr. Datta was in severe pain.  When he would lie down, sharp pain would shoot down from his lower back into his right buttock and right leg.

36.    He asked the correctional officer who was watching his pod to send him to the medical unit of the Jail.

37.    The officer told him that since he was not having a seizure or heart attack, he could wait.

38.     Mr. Datta's condition continued to worsen.   About two hours later, two correctional officers arrived at his cell to take Mr. Datta to the medical unit.

39.     At that time, Mr. Datta was in a cell on the second tier.   Mr. Datta had to be assisted by one of the officers to get to the stairs.

40.     To go down the stairs, he again had to be assisted by one of the officers while holding onto the stair railing.

41.     Once he got down the stairs, he was put in a wheelchair and wheeled to the medical unit.

42.     After sitting in the medical unit in a wheelchair for approximately two hours, Nurse Ennis, the night shift charge nurse on duty, saw him in the medical unit at approximately 10:43 p.m.

43.     Nurse Ennis was aware of Mr. Datta's prior medical history concerning his lower back.

44.     By this time, Mr. Datta could not walk and could only stand for a few seconds, he had severe pain in his lower back, he could not feel his right leg except for a burning sensation, and his right foot was cold and turning blue, all of which he reported to Nurse Ennis.

45.     She told Mr. Datta that he probably had a pinched sciatic nerve.

46.     She applied Bengay and hot towels to Mr. Datta's lower back area and he was given Tylenol and/or Motrin.

47.     No tests were performed on Mr. Datta, no imaging studies were performed, and he was not seen by a physician.

48.     Mr. Datta asked Nurse Ennis to send him to the hospital, but she refused to do so.

49.     Instead, Nurse Ennis sent Mr. Datta back to the general population.

50.   He limped back to general population using the wall for assistance.

51.   According to the Jail medical records, after Nurse Ennis discharged Mr. Datta back to the general population, she called Dr. Simeon and informed Dr. Simeon of Mr. Datta's presentation to the medical unit.  Dr. Simeon ordered that Mr. Datta could have two mattresses and Bengay applied twice daily as needed for the next five days.

52.   However, Dr. Simeon did not go in and examine Mr. Datta that night nor did he examine Mr. Datta the following day, which was a Friday.

53.   When Mr. Datta returned to general population, he was relocated to a lower tier cell and was given a double mattress.

54.   Mr. Datta could not sleep that night because of the pain.

55.   He asked the correctional officers to send him back to the medical unit, but they denied his requests.

56.   Mr. Datta was told by one of the officers that he could see a nurse when the nurse comes up to the pod in the morning.  He suffered through the night.

57.   On the morning of Friday, April 18th, Mr. Datta tried to walk to the shower.  His legs collapsed, and he fell to the floor.  He could not get up on his own power.

58.   The correctional officers just stood there and looked at him on the floor.

59.   Other inmates assisted Mr. Datta up off of the floor and to the shower and brought a chair into the shower so that he could sit in the shower.

60.   After showering, he was able to get dressed sitting in the chair, and he then returned to his cell with the assistance of inmates and a correctional officer.

61.    Nurses came to the pod on the morning and the night of April 18th.  Mr. Datta told them that he needed medical attention.  The nurses did not examine him, and they refused to send him back to the medical unit.

62.    On Saturday, April 19th, Mr. Datta's condition was worse.

63.    He was taken back to medical unit that night by wheelchair.

64.    He was in intense pain.

65.    He was seen by Nurse Atkinson, who was the charge nurse on duty that night, and Karen Danielle Borkowski, LPN ("Nurse Borkowski"), who is also an employee of ACHS.

66.    He told the nurses that he that he could not feel anything from his waist to his feet other than an extremely painful burning sensation in his legs, that he tried to use the bathroom but was unable to make himself go, and that he could not put any pressure on his legs and could not walk.

67.    Nurse Borkowski noted that he was anxious and shaking and had an elevated blood pressure, among other things.

68.    The nurses told him he would stay in the medical unit that night and would be evaluated by a nurse in the morning.

69.    Nurse Atkinson or Nurse Borkowski called Dr. Simeon.

70.    Dr. Simeon ordered blood pressure medication for Mr. Datta and that Mr. Datta could be kept in the medical unit for observation, but otherwise did nothing to treat Mr. Datta's condition.

71.    Dr. Simeon did not go into see the patient that night or examine him the following morning.

72.    Mr. Datta was put in a cell in the medical unit.

73.    As the night went on and into the early morning hours of April 20th, the pain continued to worsen, and Mr. Datta complained repeatedly for help to the nurses and correction officers.

74.    His complaints and calls for help to the nurses were ignored.

75.    Mr. Datta began complaining and calling for help louder and louder, eventually screaming that something was seriously wrong with him.

76.    Instead of providing him with any help or treatment, the charge nurse Nurse Atkinson had Mr. Datta moved into a special management cell, which was a concrete room with doors made of steel between the cell and the hallway, so he and the other nurses and officers did not have to listen to Mr. Datta screaming for medical attention.

77.    Mr. Datta banged on the concrete wall and the steel door of the special management cell trying to get the nurses' and officers' attention until he eventually passed out from the pain.

78.    The following morning, Sunday, April 20, 2014, Nurse Burk, the day shift charge nurse, and another nurse were on duty in the medical unit.

79.    According to the Jail medical records, Nurse Burk spoke with Dr. Simeon on the telephone regarding Mr. Datta.

80.    Once again Dr. Simeon did not go to the Jail to evaluate Mr. Datta, but instead ordered that the Jail hold the naproxen (also known as Aleve) and replace it with Motrin.

81.    Around 9:00 am that morning, Mr. Datta was taken out of special management cell to a room where he was assessed by Nurse Burk.

82.    Mr. Datta told Nurse Burk that he could not feel anything below his waist or move his legs appropriately.

83.   He also told Nurse Burk that he had not had a bowel movement for days.

84.   Nurse Burk did a strength test on his arms, wherein Mr. Datta pushed his arms against the nurse's hands.  However, she did not test the strength of his legs.

85.   After that, Nurse Burk took a sharp object and rubbed it across the bottom of his feet.  He could not feel it and told Nurse Burk that.

86.   Nurse Burk documented that Mr. Datta had bilateral lower extremity numbness, that he was numb to tactile touch of legs bilaterally, that he had pain radiating down his legs, that he was making "crying, sob like noises," that he had been constipated for four days, and that his condition began three days earlier and was worsening.

87.   Mr. Datta was not evaluated by a doctor at that time.

88.   Nurse Burk sent him back to a cell in the medical unit by wheelchair.

89.   About an hour later, he needed to use the toilet, which was in the cell.  He asked Nurse Burk and another nurse for help to transfer from his wheelchair to the toilet because he had lost feeling and the strength in his legs.  The nurses told him he had to do it on his own. While trying to transfer himself from his wheelchair to the toilet, he collapsed and fell to the floor.

90.   While on the floor, he became incontinent of bowel and bladder and defecated and urinated himself.  The nurses and an officer came over and told him to get up.  Mr. Datta told them that he could not.  At some point they tried to slide a mat under Mr. Datta.  He screamed in pain, so they just left him lying on the floor in his stool and urine.

91.   One of the nurses or correctional officers cut Mr. Datta's pants off of him, and they left him lying on the floor exposed.

92.   Mr. Datta was given a wet towel and told to clean himself up.

93. He was accused of being uncooperative. He was harassed, taunted and embarrassed.

94. Female inmates were walked by the cell and were able to view him as he lay there on the floor exposed and covered in urine and stool.

95. Mr. Datta asked the nurses and officers repeatedly to get him up off the floor and to send him to the hospital, but they refused to do so.

96. According to the Jail medical records, Nurse Burk called Dr. Simeon that afternoon on the telephone, apparently while Mr. Datta was still lying on the floor, to update him on Mr. Datta's condition and the events that had transpired.

97. Once again, Dr. Simeon did not go to the Jail to evaluate Mr. Datta.

98. Instead, Dr. Simeon told Nurse Burk to leave the mat on the floor next to Mr. Datta, and ordered Prednisone and xrays of Mr. Datta's hips and spine to be taken the following day.

99. Eventually, after Mr. Datta had been on the floor for approximately 2 – 2.5 hours, a couple of officers lifted him up off the floor and put him on the toilet.

100. He asked the nurses and officers to take him to the shower, and they told him he could not shower until the next morning.

101. Mr. Datta was given a new pair of pants and put back in the wheelchair.

102. Mr. Datta slept mostly in the wheel chair that night because every time he tried to lie down in the bed, the pain got worse.

103. On the morning of Monday, April 21st, Nurse Comegys performed a routine history and physical examination on Mr. Datta.

104. Nurse Comegys performs routine history and physical examinations on all inmates within fourteen days of their incarceration at the Jail.

105. She documented that Mr. Datta told her that he had numbness and weakness in both legs, that he could not feel his penis, that he had lower back pain, that he had numbness in the toes of both feet, that he could move his toes or ankle on the right foot and that his left foot was also effected, that he was constipated and that he was having anxiety from his medical issues.

106. In addition, Nurse Burk, who was the charge nurse on duty that morning, documented that Mr. Datta was unable to walk and that he complained of pins and needles in his legs and feet bilaterally and urinary incontinence.

107. Dr. Simeon finally saw Mr. Datta that morning.

108. At that time, Mr. Datta was still in wheelchair, and still experiencing incontinence, back and leg pain, numbness below his waist and in his lower extremities, tingling in his lower extremities, and he could not walk, all of which Dr. Simeon and the nurses were aware of.

109. Dr. Simeon reviewed Mr. Datta's Jail medical records and performed a brief exam on Mr. Datta.

110. The xrays ordered by Dr. Simeon of Mr. Datta's lower back and hips were taken.

111. Dr. Simon ordered gabapentin, which is medication for nerve pain, an elastic knee brace, and crutches for Mr. Datta and that Mr. Datta could have a double mattress while in the infirmary.

112. Dr. Simeon did not order or send Mr. Datta to have a MRI, or any other follow up radiological examination.

113. Dr. Simeon did not provide Mr. Datta with a diagnosis.

114. Mr. Datta asked Dr. Simeon to send him to the hospital.

115. Dr. Simeon told him he was not going to the hospital.

116. Instead, Dr. Simeon admitted him to the Jail infirmary as a level three patient.

117. Inmates admitted as level three patients require the least amount of medical attention.

118. Level three patients are to be seen one time per week by a physician.

119. Mr. Datta's condition was not treated by Dr. Simeon and worsened further.

120. Mr. Datta was put back in a cell in the medical unit.

121. Nurse Ennis was the charge nurse on duty that night.

122. She documented that Mr. Datta was crying in pain.

123. She called Practitioner Carstens, who ordered pain medication and that Mr. Datta may have two mattresses.

124. During the early morning hours of April 23, 2014, Mr. Datta again fell while transferring himself to the toilet.

125. He was found by Nurse Ennis who was the charge nurse on duty lying on the floor next to the toilet crying and very emotional.

126. Nurse Ennis again called Practitioner Carstens, who ordered ice for his knee.

127. Mr. Datta remained in medical unit at the Jail until April 23, 2014.

128. The brief evaluation Dr. Simeon performed on Mr. Datta on April 21, 2014 was the only examination Dr. Simeon, or any other medical doctor, performed on Mr. Datta during the period he was incarcerated at the Sarasota County Jail from April 11, 2014 through April 23, 2014.

129. On Wednesday, April 23, 2014, Mr. Datta had a court appearance.

130. The courtroom was located in the same building as the Jail.

131. An officer wheeled him over to the courtroom in a wheelchair because Mr. Datta was still unable to walk.

132. He was released from the Jail by the Court and ordered to house arrest, but the judge granted him permission to go to a hospital before beginning house arrest.

133. The officers at the Jail would not arrange for him to be transported to a hospital, so he wheeled himself to a payphone outside of the Jail and called an ambulance.

134. Sarasota Emergency Medical Services arrived within a couple of minutes of Mr. Datta's call and took him to the emergency department at Sarasota Memorial Hospital (the "Hospital").

135. At the Hospital, Mr. Datta reported his condition and the symptoms he had been experiencing while incarcerated at the Jail.

136. Mr. Datta was examined by a physician's assistant and a physician in the emergency department within minutes of his arrival.

137. He was found to have bilateral leg weakness and numbness, saddle/groin numbness, and bladder and bowel dysfunction, all of which he had previously reported to the medical staff at Sarasota County Jail at least 3 days earlier.

138. The physician and physician's assistant in the emergency department suspected cauda equina syndrome and ordered a MRI.

139. The MRI revealed a large disk herniation at L2-L3 compressing the cauda equina in the setting of spinal stenosis in a congenitally narrow canal.

140.    Mr. Datta was diagnosed with cauda equina syndrome and informed by his medical providers at the Hospital that he needed emergency surgery.

141.    Andrew Fine, M.D., a neurosurgeon at the Hospital, performed L2-L3 laminectomies bilaterally and microdiskectomy.

142.    He remained in the Hospital until June 3, 2014 for recovery, rehabilitation and physical therapy.

143.    Despite the decompression surgery performed by Dr. Fine, Mr. Datta has permanent and profound neurological deficits, as a result of the several day delay in receiving appropriate medical care for his condition, while an inmate at the Jail.

144.    Significantly, Mr. Datta continues to have saddle paresthesia, bowel and bladder dysfunction, inability to obtain an erection, bilateral weakness in his lower extremities, and decreased sensation and tingling in his lower extremities, among other issues.

145.    In addition, he is in constant pain and requires daily pain medication.

146.    Mr. Datta will have to live with these injuries for the rest of his life.

147.    When the subject events occurred, Mr. Datta was just 22 years old.

148.    At all times material hereto, there existed a health care provider/patient relationship between Mr. Datta and the Defendants, individually, as well as by and through their employers, employees, servants, agents, and/or apparent agents.

**COUNT I**
**CLAIM AGAINST ARMOR CORRECTIONAL HEALTH SERVICES, INC. FOR DEPRIVATION OF CHRISTOPHER DATTA'S CONSTITUTIONAL RIGHTS**

149.    This is an action against ACHS for deliberate indifference to the serious medical needs of Mr. Datta brought pursuant to the Eighth Amendment of the United States Constitution and 42 U.S.C. §1983.

150. Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 148, above, as if fully set forth herein.

151. To the extent that this count is inconsistent with any other count herein, it is brought in the alternative.

152. At all times material hereto, ACHS had an obligation to provide medical care to inmates in custody at the Jail, including, but not limited to, Mr. Datta.

153. While providing medical care and treatment to inmates at the Jail, including, but not limited to, Mr. Datta, ACHS is acting under color of state law.

154. While Mr. Datta was incarcerated at the Jail, ACHS became aware that Mr. Datta had a serious medical condition that posed a substantial risk of serious harm if not adequately treated.

155. Despite being aware of Mr. Datta's serious medical condition, ACHS, through deliberate indifference, failed to provide Mr. Datta with the medical care and services necessary to evaluate and treat that condition.

156. The contract between the Sarasota County Sherriff's Office and ACHS dis-incentivizes ACHS from sending inmates, such as Mr. Datta, to a hospital for emergency medical services, for hospitalization, or for off-site medical specialist care, by requiring ACHS to pay the costs of such services if the inmate does not have health insurance to pay for such services.

157. ACHS has a widespread policy, custom or practice at the Jail whereby ACHS's medical personnel and employees, including, but not limited to, its doctors, nurse practitioners, nurses and other personnel are encouraged not to send inmates to the hospital for emergency medical services and to delay sending inmates to the hospital for emergency medical services.

158.    ACHS also has a widespread policy, custom or practice at the Jail whereby ACHS's medical personnel and employees, including, but not limited to, its doctors, nurse practitioners, nurses and other personnel are discouraged from requesting diagnostic studies that are not available at the Jail, such as a MRI, to assist in the evaluation and diagnosis of an inmate's medical condition.

159.    ACHS implemented, established and/or encouraged these policies, customs or practices for financial reasons and in deliberate indifference to the serious medical needs of inmates, such as Mr. Datta, at the Jail.

160.    ACHS also has a widespread policy, custom or practice of asking inmates upon an initial intake screening whether they have health insurance.

161.    ACHS knew that Mr. Datta did not have health insurance while he was an inmate at the Jail from April 11, 2014 through April 23, 2014.

162.    ACHS and its employees knew that if they sent Mr. Datta to a hospital emergency department for emergency medical services and treatment or for a MRI or other radiologic diagnostic testing, to evaluate his condition, ACHS would have to bear the costs of such services and treatment.

163.    ACHS knew that Mr. Datta had serious neurological deficits that required a MRI or similar radiologic diagnostic testing and emergent evaluation and treatment but did not send Mr. Datta to the emergency department acting in accordance with its policy, custom or practice, to save money.

164.    ACHS acted with deliberate indifference to the serious medical needs of Mr. Datta by having a policy, custom or practice that directly and proximately resulted in its failure

to send Mr. Datta to the emergency department for evaluation and treatment, and caused permanent neurological injuries to Mr. Datta.

165. ACHS violated Mr. Datta's Eighth Amendment right to be free from cruel and unusual punishment by the deliberate indifference to Mr. Datta's medical needs.

WHEREFORE, Mr. Datta demands judgment against ACHS for damages, plus costs, attorney's fees and such other relief as this Court deems just and proper, and demands a trial by jury on all issues.

## COUNT II
## CLAIM AGAINST FRANTZ SIMEON, M.D. FOR VIOLATION OF CHRISTOPHER DATTA'S CIVIL RIGHTS UNDER 42 U.S.C. §1983

166. This is an action against Dr. Simeon for deliberate indifference to the serious medical needs of Mr. Datta brought pursuant to the Eighth Amendment of the United States Constitution and 42 U.S.C. §1983.

167. Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 148, above, as if fully set forth herein.

168. To the extent that this count is inconsistent with any other count herein, it is brought in the alternative.

169. At all material times hereto, Dr. Simeon was a physician employed by ACHS and the medical director at the Jail.

170. He has an obligation to provide medical care to inmates at the Jail.

171. While providing medical care and treatment to inmates of the Jail, including, but not limited to, Mr. Datta, Dr. Simeon is acting under color of state law.

172.    While Mr. Datta was incarcerated at the Jail, Dr. Simeon became aware that Mr. Datta had a serious medical condition that posed a substantial risk of serious harm if not adequately evaluated and treated.

173.    Despite being aware of Mr. Datta's serious medical condition, Dr. Simeon, through deliberate indifference, failed to provide Mr. Datta with the medical care and services necessary to evaluate and treat that condition.

174.    Dr. Simeon knew of Mr. Datta's history of lower back problems, including, but not limited to spinal stenosis, bulging/herniated disk, and degenerative disk disease.

175.    Based on reports from the nursing staff, Dr. Simeon knew:

(a)    that Mr. Datta injured or aggravated his lower back condition on April 17, 2014, and that Mr. Datta had severe pain in his lower back, could not feel his right leg except for a burning sensation and could not walk upon arrival to the medical unit;

(b)    that by April 19, 2014, Mr. Datta's condition was significantly worse, he was back in the medical unit, in a wheelchair, in severe pain, and could not feel anything from his waist to his feet other than an extremely painful burning sensation in his legs; that his bowel and bladder were not functioning appropriately; that he was not able to walk or use his legs appropriately; and that he was anxious and shaking and had an elevated blood pressure;

(c)    that by April 20, 2014, Mr. Datta could not feel anything below his waist except for severe pain radiating down his legs, that he was numb to tactile touch of legs bilaterally, that he was incontinent of bowel and bladder, that he was still unable to walk and could not move his legs appropriately, that he fell to the floor while trying to transfer himself from his wheelchair to the toilet, and that he could not get up on his own.

176. Dr. Simeon was called by the nursing staff at least four times between April 17, 2014 through April 20, 2014 regarding Mr. Datta's condition.

177. Nevertheless, Dr. Simeon did not go into the Jail to see and evaluate his patient because he did not want to interrupt his weekend.

178. On Monday, April 21, 2014, Dr. Simeon knew from his own examination and reports from the nurses based on their assessments of Mr. Datta that morning, which were documented in Mr. Datta's medical record, that Mr. Datta was still unable to walk, was incontinent, had numbness below his waist, could not feel his penis, had numbness and tingling in his lower extremities, had weakness in both legs, had numbness in the toes of both feet, could not move his toes or ankle on the right foot and that his left foot was also effected, was in pain, and was having anxiety from his medical issues.

179. Dr. Simeon knew that those were signs and symptoms of severe neurological deficits.

180. Dr. Simeon knew that Mr. Datta's condition was mostly likely the result of severe nerve compression, which is a serious medical need that requires immediate medical care.

181. Dr. Simeon knew that xrays are not adequate for evaluating a disk herniation or nerve compression.

182. Dr. Simeon knew that a MRI or similar radiologic study was necessary to adequately evaluate Mr. Datta's condition.

183. Nevertheless, Dr. Simeon ordered a xray because that was available at the Jail and at little or no cost to ACHS, and he failed and refused to send Mr. Datta to a hospital so that a MRI or other proper evaluation of Mr. Datta could be performed.

184.    Dr. Simeon did so in accordance with ACHS's widespread policy, custom or practice to not send inmates to the hospital for emergency medical services or to delay sending the inmates for emergency medical services to avoid incurring the cost for such services which ACHS was contractually obligated to pay.

185.    Dr. Simeon put the financial interests of ACHS ahead of the serious medical needs of Mr. Datta.

186.    Despite the fact that Mr. Datta has a serious medical need that required emergent medical attention, Dr. Simeon acted with deliberate indifference to the serious medical needs of Mr. Datta.

187.    Dr. Simeon violated Mr. Datta's Eighth Amendment right to be free from cruel and unusual punishment by the deliberate indifference to Mr. Datta's serious medical needs.

WHEREFORE, Mr. Datta demands judgment against Dr. Simeon for damages, plus costs, attorney's fees and such other relief as this Court deems just and proper, and demands a trial by jury on all issues.

## COUNT III
### CLAIM AGAINST LISA BURK, R.N. FOR VIOLATION OF CHRISTOPHER DATTA'S CIVIL RIGHTS UNDER 42 U.S.C. §1983

188.    This is an action against Nurse Burk for deliberate indifference to the serious medical needs of Mr. Datta brought pursuant to the Eighth Amendment of the United States Constitution and 42 U.S.C. §1983.

189.    Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 148, above, as if fully set forth herein.

190.    To the extent that this count is inconsistent with any other count herein, it is brought in the alternative.

191.    At all material times hereto, Nurse Burk was employed by ACHS as a charge nurse at the Jail.

192.    Nurse Burk has an obligation to provide nursing care and treatment to inmates at the Jail.

193.    While providing care and treatment to inmates of the Jail, including, but not limited to, Mr. Datta, Nurse Burk is acting under color of state law.

194.    While Mr. Datta was incarcerated at the Jail, Nurse Burk became aware that Mr. Datta had a serious medical condition that posed a substantial risk of serious harm if not adequately treated.

195.    Despite being aware of Mr. Datta's serious medical condition, Nurse Burk, through deliberate indifference, failed to provide Mr. Datta with the medical care and services necessary to evaluate and treat that condition.

196.    Based on reports and documentation from other nurses, Nurse Burk knew:

(a)    that Mr. Datta had a history of lower back problems, including, but not limited to spinal stenosis, bulging/herniated disk, and degenerative disk disease;

(b)    that Mr. Datta injured or aggravated his lower back condition on April 17, 2014, and that Mr. Datta had severe pain in his lower back, could not feel his right leg except for a burning sensation and could not walk upon arrival to the medical unit; and

(c)    that by April 19, 2014, Mr. Datta's condition was significantly worse, he was back in the medical unit, in a wheelchair, in severe pain, and could not feel anything from his waist to his feet other than an extremely painful burning sensation in his legs; that his bowel and bladder were not functioning appropriately; that he was not able to

walk or use his legs appropriately; and that he was anxious and shaking and had an elevated blood pressure.

197.    Nurse Burk was the charge nurse in the medical unit at the Jail during the day shift on Sunday, April 20, 2014.

198.    Nurse Burk assessed Mr. Datta that day.

199.    On April 20th, Nurse Burk was aware that Mr. Datta could not feel anything below his waist except for severe pain radiating through his legs, that he was numb to tactile touch of legs bilaterally, that he had not had a bowel movement for four days, and that he was still unable to walk and or move his legs appropriately.

200.    Nurse Burk was present in the medical unit when Mr. Datta fell to the floor while trying to transfer himself from his wheelchair to the toilet.

201.    She knew that he was incontinent of bowel and bladder and soiled himself uncontrollably as he lied on the floor.

202.    She knew that Mr. Datta remained on the floor, unable to get up, for approximately 2-2.5 hours and that he eventually had to be lifted off the floor by correctional officers.

203.    She knew that Mr. Datta had a serious medical condition and needed immediate medical attention.

204.    She called Dr. Simeon twice concerning Mr. Datta's condition that day.

205.    She knew that Dr. Simeon would not be coming in to evaluate the patient that day.

206.    Mr. Datta asked her to send him to the emergency department.

207.    Despite her awareness of Mr. Datta's serious medical condition, she refused to send him to the emergency department for the evaluation and treatment he needed.

208.    Nurse Burk was also Mr. Datta's charge nurse during the day shift on April 21, 2014.

209.    On April 21st, she knew that Mr. Datta was still unable to walk, was incontinent, had numbness below his waist, could not feel his penis, had numbness and tingling in his lower extremities, had weakness in both legs, had numbness in the toes of both feet, could not move his toes or ankle on the right foot and that his left foot was also effected, was in pain, and was having anxiety from his medical issues.

210.    On April 21st, she was aware that Mr. Datta was still suffering from an emergency medical condition.

211.    Once again, she failed or refused to send him to the emergency department for the treatment he needed.

212.    Nurse Burk refused to send Mr. Datta to the emergency room in accordance with ACHS's widespread policy, custom or practice to not send inmates to the hospital for emergency medical services or to delay sending the inmates for emergency medical services to avoid incurring the cost for such services which ACHS is contractually obligated to pay.

213.    Nurse Burk put the financial interests of ACHS ahead of the serious medical needs of Mr. Datta.

214.    Despite the fact that Mr. Datta has a serious medical need that required emergent medical attention, Nurse Burk acted with deliberate indifference to the serious medical needs of Mr. Datta.

215. Nurse Burk violated Mr. Datta's Eighth Amendment right to be free from cruel and unusual punishment by the deliberate indifference to Mr. Datta's serious medical needs.

WHEREFORE, Mr. Datta demands judgment against Nurse Burk for damages, plus costs, attorney's fees and such other relief as this Court deems just and proper, and demands a trial by jury on all issues.

**COUNT IV**
**CLAIM AGAINST JAMES ATKINSON, R.N. FOR VIOLATION OF CHRISTOPHER DATTA'S CIVIL RIGHTS UNDER 42 U.S.C. §1983**

216. This is an action against Nurse Atkinson for deliberate indifference to the serious medical needs of Mr. Datta brought pursuant to the Eighth Amendment of the United States Constitution and 42 U.S.C. §1983.

217. Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 148, above, as if fully set forth herein.

218. To the extent that this count is inconsistent with any other count herein, it is brought in the alternative.

219. At all material times hereto, Nurse Atkinson was employed by ACHS as a charge nurse at the Jail.

220. Nurse Atkinson has an obligation to provide nursing care and treatment to inmates at the Jail.

221. While providing care and treatment to inmates of the Jail, including, but not limited to, Mr. Datta, Nurse Atkinson is acting under color of state law.

222. While Mr. Datta was incarcerated at the Jail, Nurse Atkinson became aware that Mr. Datta had a serious medical condition that posed a substantial risk of serious harm if not adequately treated.

223.    Despite being aware of Mr. Datta's serious medical condition, Nurse Atkinson, through deliberate indifference, failed to provide Mr. Datta with the medical care and services necessary to evaluate and treat that condition.

224.    Based on reports and documentation from other nurses, Nurse Atkinson knew:

(a)    that Mr. Datta had a history of lower back problems, including, but not limited to spinal stenosis, bulging/herniated disk, and degenerative disk disease; and

(b)    that Mr. Datta injured or aggravated his lower back condition on April 17, 2014, and that Mr. Datta had severe pain in his lower back, could not feel his right leg except for a burning sensation, and could not walk upon arrival to the medical unit.

225.    Nurse Atkinson was the charge nurse in the medical unit at the Jail during the night shift on Saturday, April 19, 2014 when Mr. Datta returned to the medical unit in a wheelchair with a progressively worsening condition.

226.    On April 19th, Nurse Atkinson knew from his own assessment or from a report from Nurse Borkowski, who was working under his supervision and direction on that shift, that Mr. Datta's condition was significantly worse than it was on April 17th, that Mr. Datta was in severe pain, that Mr. Datta could not feel anything from his waist to his feet other than an extremely painful burning sensation in his legs, that his bowel and bladder were not functioning appropriately, that he was not able to walk or use his legs appropriately, and that he was anxious and shaking and had an elevated blood pressure.

227.    Nurse Atkinson knew that Mr. Datta had a serious medical condition in need of immediate medical attention.

228.    Nurse Atkinson, or Nurse Borkowski at Nurse Atkinson's direction, called Dr. Simeon concerning Mr. Datta's condition that night.

229. Nurse Atkinson spoke with Dr. Simeon that night.

230. Nurse Atkinson knew that Dr. Simeon would not be coming in to evaluate Mr. Datta that night or the following day.

231. Mr. Datta asked Nurse Atkinson to send him to the emergency department.

232. Despite his awareness of Mr. Datta's serious medical condition, Nurse Atkinson refused to send him to the emergency department for the evaluation and treatment he needed, and instead, had Mr. Datta placed in a special containment cell with concrete walls and steel doors, so that he and the other nurses and officers would not have to listen to Mr. Datta scream for help.

233. Nurse Atkinson refused to send Mr. Datta to the emergency room in accordance with ACHS's widespread policy, custom or practice to not send inmates to the hospital for emergency medical services or to delay sending the inmates for emergency medical services to avoid incurring the cost for such services which ACHS is contractually obligated to pay.

234. Nurse Atkinson put the financial interests of ACHS ahead of the serious medical needs of Mr. Datta.

235. Despite the fact that Mr. Datta has a serious medical need that required emergent medical attention, Nurse Atkinson acted with deliberate indifference to the serious medical needs of Mr. Datta.

236. Nurse Atkinson violated Mr. Datta's Eighth Amendment right to be free from cruel and unusual punishment by the deliberate indifference to Mr. Datta's serious medical needs.

WHEREFORE, Mr. Datta demands judgment against Nurse Atkinson for damages, plus costs, attorney's fees and such other relief as this Court deems just and proper, and demands a trial by jury on all issues.

## COUNT V
## CLAIM AGAINST LARA ENNIS, R.N. FOR VIOLATION OF CHRISTOPHER DATTA'S CIVIL RIGHTS UNDER 42 U.S.C. §1983

237.    This is an action against Nurse Ennis for deliberate indifference to the serious medical needs of Mr. Datta brought pursuant to the Eighth Amendment of the United States Constitution and 42 U.S.C. §1983.

238.    Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 148, above, as if fully set forth herein.

239.    To the extent that this count is inconsistent with any other count herein, it is brought in the alternative.

240.    At all material times hereto, Nurse Ennis was employed by ACHS as a charge nurse at the Jail.

241.    Nurse Ennis has an obligation to provide nursing care and treatment to inmates at the Jail.

242.    While providing care and treatment to inmates of the Jail, including, but not limited to, Mr. Datta, Nurse Ennis is acting under color of state law.

243.    While Mr. Datta was incarcerated at the Jail, Nurse Ennis became aware that Mr. Datta had a serious medical condition that posed a substantial risk of serious harm if not adequately treated.

244.    Despite being aware of Mr. Datta's serious medical condition, Nurse Ennis, through deliberate indifference, failed to provide Mr. Datta with the medical care and services necessary to evaluate and treat that condition.

245.    Nurse Ennis was the night shift charge nurse responsible for Mr. Datta's care on April 17, 2014 when Mr. Datta first presented to the medical unit with an injury or aggravation to his lower back.

246.    She was also the night shift charge nurse responsible for Mr. Datta's care on April 21, 2014, April 22, 2014 and April 23, 2014.

247.    Based on her own assessments and reports and documentation from other nurses, Nurse Ennis knew:

(a)    that Mr. Datta had a history of lower back problems, including, but not limited to spinal stenosis, bulging/herniated disk, and degenerative disk disease;

(b)    that Mr. Datta injured or aggravated his lower back condition on April 17, 2014, and that Mr. Datta had severe pain in his lower back, could not feel his right leg except for a burning sensation and could not walk upon arrival to the medical unit;

(c)    that by April 19, 2014, Mr. Datta's condition was significantly worse, he was back in the medical unit, in a wheelchair, in severe pain, and could not feel anything from his waist to his feet other than an extremely painful burning sensation in his legs; that his bowel and bladder were not functioning appropriately; that he was not able to walk or use his legs appropriately; and that he was anxious and shaking and had an elevated blood pressure;

(d)    that by April 20, 2014, Mr. Datta could not feel anything below his waist except for severe pain radiating down his legs, that he was numb to tactile touch of legs bilaterally, that he was incontinent of bowel and bladder, that he was still unable to walk and could not move his legs appropriately, that he fell to the floor while trying to transfer himself from his wheelchair to the toilet, and that he could not get up on his own; and

(e)    that on Monday, April 21, 2014, Mr. Datta was still unable to walk, was incontinent, had numbness below his waist, could not feel his penis, had numbness and tingling in his lower extremities, had weakness in both legs, had numbness in the toes of both feet, could not move his toes or ankle on the right foot and that his left foot was also effected, was in pain, and was having anxiety from his medical issues.

248.    During the early morning hours of April 23, 2014, Nurse Ennis found Mr. Datta laying on the floor next to the toilet crying and very emotional, after having fallen trying transfer himself back into his wheelchair.

249.    After consulting with a Nurse Practitioner, Nurse Ennis gave Mr. Datta ice.

250.    Nurse Ennis knew that by April 21, 2014, if not earlier, that Mr. Datta had a serious medical condition in need of immediate medical attention, and that it remained an emergent medical condition at all times thereafter.

251.    Despite her awareness of Mr. Datta's serious medical condition, she refused to send him to the emergency department for the evaluation and treatment he needed.

252.    Nurse Ennis refused to send Mr. Datta to the emergency room in accordance with ACHS's widespread policy, custom or practice to not send inmates to the hospital for emergency medical services or to delay sending the inmates for emergency medical services to avoid incurring the cost for such services which ACHS is contractually obligated to pay.

253.    Nurse Ennis put the financial interests of ACHS ahead of the serious medical needs of Mr. Datta.

254.    Despite the fact that Mr. Datta has a serious medical need that required emergent medical attention, Nurse Ennis acted with deliberate indifference to the serious medical needs of Mr. Datta.

255.    Nurse Ennis violated Mr. Datta's Eighth Amendment right to be free from cruel and unusual punishment by the deliberate indifference to Mr. Datta's serious medical needs.

WHEREFORE, Mr. Datta demands judgment against Nurse Ennis for damages, plus costs, attorney's fees and such other relief as this Court deems just and proper, and demands a trial by jury on all issues.

## COUNT VI
## CLAIM AGAINST SONJA CARSTENS, ARNP, FOR VIOLATION OF CHRISTOPHER DATTA'S CIVIL RIGHTS UNDER 42 U.S.C. §1983

256.    This is an action against Practitioner Carstens for deliberate indifference to the serious medical needs of Mr. Datta brought pursuant to the Eighth Amendment of the United States Constitution and 42 U.S.C. §1983.

257.    Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 148, above, as if fully set forth herein.

258.    To the extent that this count is inconsistent with any other count herein, it is brought in the alternative.

259.    At all material times hereto, Practitioner Carstens was employed by ACHS as a nurse practitioner at the Jail.

260.    Practitioner Carstens has an obligation to provide medical care and treatment to inmates at the Jail.

261.    While providing care and treatment to inmates of the Jail, including, but not limited to, Mr. Datta, Practitioner Carstens is acting under color of state law.

262.    While Mr. Datta was incarcerated at the Jail, Practitioner Carstens became aware that Mr. Datta had a serious medical condition that posed a substantial risk of serious harm if not adequately treated.

263. Despite being aware of Mr. Datta's serious medical condition, Practitioner Carstens, through deliberate indifference, failed to provide Mr. Datta with the medical care and services necessary to evaluate and treat that condition.

264. Practitioner Carstens was on-call during the night shifts of April 21, 2014 and April 22, 2014.

265. Based on reports and documentation from nurses, Practitioner Carstens knew:

(a) that Mr. Datta had a history of lower back problems, including, but not limited to spinal stenosis, bulging/herniated disk, and degenerative disk disease;

(b) that Mr. Datta injured or aggravated his lower back condition on April 17, 2014, and that Mr. Datta had severe pain in his lower back, could not feel his right leg except for a burning sensation and could not walk upon arrival to the medical unit;

(c) that by April 19, 2014, Mr. Datta's condition was significantly worse, he was back in the medical unit, in a wheelchair, in severe pain, and could not feel anything from his waist to his feet other than an extremely painful burning sensation in his legs; that his bowel and bladder were not functioning appropriately; that he was not able to walk or use his legs appropriately; and that he was anxious and shaking and had an elevated blood pressure;

(d) that by April 20, 2014, Mr. Datta could not feel anything below his waist except for severe pain radiating down his legs, that he was numb to tactile touch of legs bilaterally, that he was incontinent of bowel and bladder, that he was still unable to walk and could not move his legs appropriately, that he fell to the floor while trying to transfer himself from his wheelchair to the toilet, and that he could not get up on his own;

(e)    that on Monday, April 21, 2014, Mr. Datta was still unable to walk, was incontinent, had numbness below his waist, could not feel his penis, had numbness and tingling in his lower extremities, had weakness in both legs, had numbness in the toes of both feet, could not move his toes or ankle on the right foot and that his left foot was also effected, was in pain, and was having anxiety from his medical issues; and

(f)    that during the early morning hours of April 23, 2014, Nurse Ennis found Mr. Datta laying on the floor next to the toilet crying and very emotional, after having fallen again trying transfer himself back into his wheelchair.

266.    Practitioner Carstens was called by Nurse Ennis on the night of April 21, 2014, and given an update concerning his condition, at which time Practitioner Carstens ordered a pain medication, Toradol, for Mr. Datta.

267.    Practitioner Carstens was called again by Nurse Ennis after Mr. Datta fell during the early morning hours of April 23, 2014 and was given an update concerning Mr. Datta's condition.

268.    At that time, Practitioner Carstens ordered ice for Mr. Datta's knee.

269.    Practitioner Carstens knew by April 21, 2014, if not earlier, that Mr. Datta had a serious medical condition in need of immediate medical attention and that it remained an emergent medical condition at all times thereafter.

270.    Despite her awareness of Mr. Datta's serious medical condition, she failed to send him to the emergency department for the evaluation and treatment he needed.

271.    Practitioner Carstens refused to send Mr. Datta to the emergency room in accordance with ACHS's widespread policy, custom or practice to not send inmates to the hospital for emergency medical services or to delay sending the inmates for emergency medical

services to avoid incurring the cost for such services which ACHS is contractually obligated to pay.

272. Practitioner Carstens put the financial interests of ACHS ahead of the serious medical needs of Mr. Datta.

273. Despite the fact that Mr. Datta has a serious medical need that required emergent medical attention, Practitioner Carstens acted with deliberate indifference to the serious medical needs of Mr. Datta.

274. Practitioner Carstens violated Mr. Datta's Eighth Amendment right to be free from cruel and unusual punishment by the deliberate indifference to Mr. Datta's serious medical needs.

WHEREFORE, Mr. Datta demands judgment against Practitioner Carstens for damages, plus costs, attorney's fees and such other relief as this Court deems just and proper, and demands a trial by jury on all issues.

## COUNT VII
## CLAIM AGAINST FRANTZ SIMEON, M.D. FOR MEDICAL MALPRACTICE

275. Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 148 above, as if fully set forth herein.

276. To the extent that this count is inconsistent with any other count herein, it is brought in the alternative.

277. Dr. Simeon was Mr. Datta's attending physician while he was an inmate at the Jail from April 11, 2014 through April 23, 2014.

278. At all times material hereto, including that period, there existed a health care provider/patient relationship between Mr. Datta and Dr. Simeon.

279.   Dr. Simeon undertook to provide medical services to Mr. Datta and owed a duty to Mr. Datta to perform such services with the care, skill, and diligence that in light of all relevant surrounding circumstances, is considered acceptable and appropriate by reasonably prudent similar health care providers.

280.   Notwithstanding his duties, Dr. Simeon deviated from the prevailing professional standard of care and breached the duty owed to Mr. Datta by his actions, inactions, errors, and omissions, including, but not limited to, the following:

(a)   failing to adequately communicate with nursing staff to obtain important information about his patient;

(b)   failing to take and document an adequate history, including, but not limited to, failing to obtain or document information concerning the patient's inability or difficulty to walk, lower extremity weakness and numbness, inability to obtain an erection, saddle paresthesia and urinary and bowel function;

(c)   failing to perform and document an adequate physical examination on Mr. Datta;

(d)   failing to react to clear signs and symptoms of serious neurological deficits and order that Mr. Datta be sent to the emergency department no later than April 20, 2014 at which time Mr. Datta was incontinent of liquid stool and urine, had saddle paresthesia, was unable to walk, and had bilateral lower extremity weakness and numbness and tingling;

(e)   failing to investigate, rule out or diagnose a herniated disk and cauda equina syndrome;

(f)   failing to provide or arrange for appropriate testing;

(g)    failing to provide or arrange for appropriate medical treatment; and

(h)    failing to obtain informed consent from Mr. Datta with regard to the course of care for Mr. Datta's medical condition.

281.    As a direct and proximate result of Dr. Simeon's actions, inactions, errors, and omissions, Mr. Datta suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The losses are either permanent or continuing in nature and Mr. Datta will suffer the losses in the future.

WHEREFORE, Mr. Datta demands judgment against Dr. Simeon for damages, plus appropriate interest, costs, and such other relief as this Court deems just and proper, and demands a trial by jury on all issues.

## COUNT VIII
## CLAIM AGAINST ARMOR CORRECTIONAL HEALTH SERVICES, INC. FOR VICARIOUS LIABILITY FOR FRANTZ SIMEON, M.D.

282.    Plaintiff realleges and incorporates the allegations contained in paragraphs one through 148 and paragraphs 277 through 281, as if fully set forth herein.

283.    To the extent that this count is inconsistent with any other count herein, it is brought in the alternative.

284.    At all times material hereto, Dr. Simeon was the agent, servant or employee of ACHS.

285.    As a result, ACHS is responsible and liable for his actions, inactions, errors, and omissions.

WHEREFORE, Mr. Datta demands judgment against ACHS for damages, plus appropriate interest, costs, and such other relief as this Court deems just and proper, and demands a trial by jury on all issues.

## COUNT IX
## CLAIM AGAINST ARMOR CORRECTIONAL HEALTH SERVICES, INC. FOR VICARIOUS LIABILITY FOR THE CONDUCT OF ITS NURSES, NURSE PRACTITIONERS AND OTHER EMPLOYEES AND AGENTS

286. Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 148, above, as if fully set forth herein.

287. To the extent that this count is inconsistent with any other count herein, it is brought in the alternative.

288. At all times material hereto, there existed a health care provider/patient relationship between Mr. Datta and ACHS acting by and through its employees, servants and agents, including, but not limited to, its physicians, nurses, and nurse practitioners, and other medical personnel.

289. At all times material hereto, ACHS owed a duty to Mr. Datta to provide medical care at a level of care, skill and treatment, which, in light of all the relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.

290. ACHS, by and through its physicians, nurses, and nurse practitioners, and other medical personnel, including but not limited to, Nurse Burk, Nurse Atkinson, Nurse Ennis, Practitioner Carstens, Nurse Comegys, Nurse Borkowski, and Kayla Stell, R.N., deviated from the prevailing professional standard of care and breached the duty owed to Mr. Datta by their actions, inactions, errors, and omissions, including, but not limited to the following:

    (a)    failing to perform adequate assessments and reassessments of Mr. Datta;

    (b)    failing to perform adequate examinations on Mr. Datta;

(c)    failing to access the chain of command to advocate for Mr. Datta;

(d)    failing to react to clear signs and symptoms of serious neurological deficits and send Mr. Datta to the emergency department in light of the fact that the following signs and symptoms were all documented in Mr. Datta's medical chart no later than April 20, 2014: he was incontinent of liquid stool and urine, had saddle paresthesia, was unable to walk, and had bilateral lower extremity weakness and numbness and tingling;

(e)    failing to review available information documented in Mr. Datta's chart regarding his condition;

(f)    failing to communicate adequate and appropriate clinical information to physicians and nurse practitioners regarding Mr. Datta's condition;

(g)    failing to follow appropriate nursing guidelines in their care of Mr. Datta; and

(h)    failing to obtain informed consent from Mr. Datta with regard to the course of care for Mr. Datta's medical condition.

291.    As a direct and proximate result of ACHS's actions, inactions, errors, and omissions, by and through its employees, servants and/or agents, Mr. Datta, suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The losses are either permanent or continuing in nature and Mr. Datta will suffer the losses in the future.

WHEREFORE, Mr. Datta demands judgment against ACHS for damages, plus appropriate interest, costs, and such other relief as this Court deems just and proper, and demands a trial by jury on all issues.

## COUNT X
## CLAIM AGAINST ARMOR CORRECTIONAL HEALTH SERVICES, INC. FOR FAILURE TO IMPLEMENT APPROPRIATE SYSTEMS

292.    Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 148, above, as if fully set forth herein.

293.    To the extent that this count is inconsistent with any other count herein, it is brought in the alternative.

294.    ACHS had a duty to adopt, implement and enforce appropriate and reasonable systems, policies, procedures, protocols, standing orders and/or guidelines for the provision of appropriate patient care to inmates at the Jail.

295.    ACHS also had a duty to train and supervise the personnel providing care, treatment and services on behalf of ACHS concerning ACHS's systems, policies, procedures, protocols, standing orders and/or guidelines in effect at the Jail.

296.    ACHS failed to adopt, implement and/or enforce appropriate and reasonable systems, policies, procedures, protocols, standing orders and/or guidelines, including, but not limited to:

      (a)    appropriate and reasonable policies and procedures for sending patients with emergency medical conditions to the emergency department;

      (b)    appropriate and reasonable policies and procedures for obtaining MRIs or other radiologic studies for patients with neurological deficits;

      (c)    appropriate and reasonable policies and procedures for communication between nurses and physicians and nurse practitioners;

(d)    appropriate and reasonable policies for the evaluation of patients with serious neurological deficits;

(e)    appropriate and reasonable policies and procedures for medical care; and

(f)    appropriate and reasonable policies and procedures for nursing care.

297.    Alternatively, ACHS failed to adequately train, orient and supervise its employees, agents, and servants, including, but not limited to, its physicians, nurse practitioners, nurses, and/or other health care providers at ACHS, concerning ACHS's policies, procedures and protocols for patient care and safety at the Jail.

298.    As a direct and proximate result of ACHS's actions, inactions, errors, and omissions, Mr. Datta suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The losses are either permanent or continuing in nature and Mr. Datta will suffer the losses in the future.

WHEREFORE, Mr. Datta demands judgment against ACHS for damages, plus appropriate interest, costs, and such other relief as this Court deems just and proper, and demands a trial by jury on all issues.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted,

de la PARTE & GILBERT, P.A.

/s/ Daniel J. McBreen
Richard A. Gilbert
Florida Bar No. 180600
Daniel J. McBreen

Florida Bar No. 0580007
Eric D. Nowak
Florida Bar No. 0072271
P.O. Box 2350
Tampa, FL  33601-2350
Telephone:  (813) 229-2775
Facsimile:  (813) 229-2712
Attorneys for Plaintiff